IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

     v.              Criminal No. 3:01cr092-12 (DJN)

CURTIS L. MCCOY,
    Defendant.

**MEMORANDUM OPINION**

On March 21, 2001, a grand jury returned an indictment against Defendant Curtis L. McCoy ("Defendant") and eleven other co-defendants, charging Defendant with one count of conspiracy to possess with intent to distribute and to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i) and 846 and one count of possession with intent to distribute and distribution of heroin in violation of § 841(a)(1). On June 6, 2001, pursuant to the terms of a written plea agreement, Defendant pled guilty to the conspiracy count, Count One. On September 14, 2001, then-United States District Judge James R. Spencer sentenced Defendant to seventy months' imprisonment followed by four years of supervised release.

In 2007, while on supervised release, Defendant committed second-degree murder. On May 20, 2008, Defendant pled guilty to violating the conditions of his supervised release and Judge Spencer sentenced Defendant to forty-four months' imprisonment, to be served consecutive to any sentence imposed by the state court for Defendant's second-degree murder conviction.

This matter now comes before the Court on Defendant's Motion for Compassionate Release (ECF No. 484), moving pursuant to 18 U.S.C. § 3582(c)(1)(A) to serve the remainder of

his sentence on home confinement in light of his age, medical conditions and the outbreak of Coronavirus Disease 2019 ("COVID-19").[1] For the reasons set forth below, the Court DENIES Defendant's Motion (ECF No. 484).

## I. BACKGROUND

Due to the age of this case, in reciting the background, the Court will rely primarily on Defendant's original presentence investigation report ("PSR"), the information that it can gather from the archived docket and the undisputed representations made in the parties' briefs.

### A. Defendant's Underlying Offense

In May or June of 2000, agents with the Drug Enforcement Administration ("DEA") received information that a Hispanic male was selling large quantities of heroin and cocaine in the Richmond area. (July 30, 2001 Presentence Investigation Report ("PSR") (ECF No. 481) ¶ 66.) On August 3, 2000, a cooperating source confirmed that he had been purchasing heroin from an individual named "Frankie" and provided Frankie's phone number to DEA agents. (PSR ¶ 67.) Agents then made a controlled, recorded phone call to Frankie and arranged to meet him at a store in Henrico County to purchase heroin. (PSR ¶ 68.) Agents completed the purchase on August 9, 2000, and later identified Frankie as Defendant's co-conspirator, Francisco Rojas ("Rojas"). (PSR ¶¶ 69-70.)

After confirming Rojas's identity, agents secured a pen register on Rojas's cell phone, which provided additional telephone numbers of individuals that Rojas had contacted. (PSR ¶

---

[1] On May 1, 2020, Defendant, proceeding *pro se*, filed his initial Motion for Sentence Modification (ECF No. 479), which also moved for his compassionate release. The Court then appointed counsel for Defendant, who filed a renewed Motion for Compassionate Release (ECF No. 484) on Defendant's behalf. Because Defendant's counsel has reviewed Defendant's initial arguments and incorporated them into Defendant's renewed Motion (ECF No. 484), for the same reasons that the Court denies Defendant's renewed Motion, the Court also DENIES Defendant's initial Motion (ECF No. 479).

2

70.) Agents also continued making controlled purchases of heroin from Rojas for the remainder of the year. (PSR ¶ 71.) Surveillance monitoring revealed that Rojas operated his narcotics business out of two apartments in Henrico County that had been leased to two other co-conspirators, Angel Lugo and Johnni Leon ("Leon"). (PSR ¶ 72.) Then, in January 2001, agents obtained permission for a wire tap of Rojas's cell phone and began monitoring his calls. (PSR ¶ 74.)

Eventually, on February 20, 2001, agents arrested Rojas, Leon and co-conspirator Ramon Sanchez-Rodriguez incident to a stop of Leon's vehicle. (PSR ¶ 75.) A search of the vehicle revealed a hidden compartment containing three bundles of heroin. (PSR ¶ 75.) Later that same day, agents executed a search warrant at the two apartments from which Rojas operated his narcotics business. (PSR ¶ 75.) During the search, agents found more than one kilogram of heroin, United States currency and a ledger containing the names of various drug dealers, with heroin amounts written next to each name. (PSR ¶ 75.)

Information obtained from suspect interviews, police reports and confidential sources identified Defendant as a distributor of cocaine and heroin who helped connect Rojas with the other co-conspirators. (PSR ¶ 77.) Defendant and the other co-conspirators all worked independently and obtained supplies of heroin and cocaine from Rojas. (PSR ¶ 78.) In total, Defendant and the other co-conspirators helped distribute over one kilogram of heroin in the Richmond area. (PSR ¶ 79.)

B.     **Procedural History**

On March 21, 2001, a grand jury returned a twenty-four-count indictment against Defendant and eleven other co-defendants, which, in relevant part, charged Defendant with one count of conspiracy to possess with intent to distribute and to distribute one kilogram or more of

heroin in violation of 21 U.S.C. §§ 846 and 841(a)(1) and one count of possession with intent to distribute and distribution of heroin in violation of § 841(a)(1). (PSR ¶¶ 1-2, 18; Indictment (ECF No. 21) at 2, 8.) On June 6, 2001, Defendant pled guilty to the conspiracy count pursuant to the terms of a plea agreement. (PSR ¶ 24; Plea Agreement (ECF No. 163).) Under the statement of facts supporting Defendant's plea agreement, the Government and Defendant agreed that, for sentencing purposes, the quantity of heroin attributable to Defendant would be at least 100 but less than 400 grams. (PSR ¶ 82; Statement of Facts ("SOF") (ECF No. 164) ¶ 2.)

While Defendant awaited sentencing, on June 13, 2001, the Government moved to revoke Defendant's conditions of release after he violated those conditions by moving in with his girlfriend, whom the Court had not approved as a third-party custodian. (ECF No. 196.) On June 20, 2001, then-United States Magistrate Judge David G. Lowe modified Defendant's conditions of release to permit him to live with his girlfriend and released Defendant pending sentencing. (ECF No. 204.)

On September 14, 2001, Defendant appeared before Judge Spencer for sentencing. (ECF Nos. 271-72.) After considering Defendant's PSR, the parties' objections and positions and the factors enumerated under 18 U.S.C. § 3553(a), Judge Spencer sentenced Defendant to seventy months' imprisonment, four years of supervised release and a $100 special assessment. (ECF Nos. 271-72.) Following Defendant's release from prison, on August 12, 2005, Defendant's probation officer petitioned for Defendant's arrest, citing five violations of Defendant's supervised release, namely: (1) his April 2005 arrest and conviction by state authorities for cruelty to animals after he abandoned two dogs; (2) the return of three urine samples that tested positive for cocaine; (3) falsely denying that he used cocaine; (4) frequenting a place where he knew individuals were using cocaine; and, (5) entering an agreement to act as an informant

4

without court permission. (Pet. on Supervised Release ("2005 Pet.") (ECF No. 418) at 2-3.) On September 9, 2005, Defendant pled guilty to violating the terms of his supervised release and Judge Spencer imposed a three-month term of home confinement with electronic monitoring and ordered Defendant to avoid the apartment complex on Ruffin Road where he had been frequenting. (ECF No. 425.) Judge Spencer also ordered Defendant to maintain his employment. (ECF No. 425.)

Two years later, on July 3, 2007, Defendant's probation officer again petitioned for Defendant's arrest after learning that Defendant had been charged with conspiracy to commit murder after shooting another individual four times, which state authorities later increased to a second-degree murder charge. (Pet. on Probation ("2007 Pet.") (ECF No. 446) at 2-3.) After Defendant pled guilty to this second violation, on May 20, 2008, Judge Spencer imposed a sentence of forty-four months' imprisonment, to be served consecutive to any sentence imposed for Defendant's underlying second-degree murder offense. (ECF No. 457.)

### C. Defendant's Motion for Compassionate Release

After Defendant began serving his sentence for violating the conditions of his supervised release, the first cases of COVID-19 emerged in the United States, including within the federal prison system. *See* Fed. Bureau of Prisons, COVID-19 Coronavirus, www.bop.gov/coronavirus (showing updated figures on the number of inmates and prison staff who have tested positive for COVID-19). In response, on May 29, 2020, Defendant moved for compassionate release pursuant to § 3582(c)(1)(A), requesting that the Court permit him to serve the remainder of his prison sentence on home confinement. (Mot. & Mem. in Supp. of Mot. for Compassionate Release ("Def.'s Mot.") (ECF No. 484) at 1.)

In support of his Motion, Defendant argues that he should be released on home confinement, because his age (50) and medical conditions render him particularly susceptible to COVID-19. (Def.'s Mot. at 1, 13-23.) Specifically, Defendant avers that he suffers from thalassemia,[2] type II diabetes, hyperlipidemia, glaucoma, hypertension and asthma, which he maintains increase the likelihood of COVID-19 complications should he contract the disease. (Def.'s Mot. at 13-23.) Defendant further contends that he has a particularized risk of contracting COVID-19, because the Bureau of Prisons ("BOP") facility at which he is housed — FCI Forrest City-Low — has the highest number of confirmed COVID-19 cases of any BOP facility in the country, with 664 positive test results out of 1,635 total tests as of the issuance of this Memorandum Opinion. Fed. Bureau of Prisons, COVID-19 Coronavirus (Aug. 31, 2020), www.bop.gov/coronavirus. Defendant argues that these numbers illustrate the BOP's failure to adequately control the spread of COVID-19, adding that conditions inherent to the prison environment only compound his risks. (Def.'s Mot. at 11-13.)

Defendant also contends that a modification of his sentence proves appropriate under the § 3553(a) factors. (Def.'s Mot. at 23-26.) Defendant notes that he has been designated to a low security facility, has received good and outstanding performance evaluations for his work as a food service cook and has participated in BOP programming while incarcerated, including courses on substance abuse, parenting, anger management, painting and drywall, healthy choices, diabetes and public speaking. (Def.'s Mot. at 23.) Defendant adds that his release would also benefit public safety and reduce the existing burden on the BOP's healthcare facilities. (Def.'s Mot. at 24.) And Defendant emphasizes that he has a strong community of support, including

---

[2] Thalassemia denotes a hereditary condition in which the blood cells have a decreased rate of hemoglobin synthesis, causing defects in the delivery of oxygen to cells. *Thalassemia*, Dorland's Illustrated Medical Dictionary (32d ed., 2012).

6

his mother, who has offered to serve as a custodian during any period of home confinement. (Def.'s Mot. at 24-25.)

Moreover, although Defendant concedes that the time to challenge the sentence for his supervised release violation has passed, he argues that he should have been sentenced to a maximum of 36 months' imprisonment based on the drug amount attributed to him under the Statement of Facts, meaning that he would no longer be in custody if properly sentenced. (Def.'s Mot. at 2-3, 6.) Defendant contends that the Court should consider this sentencing discrepancy in deciding whether to modify Defendant's sentence under the § 3553(a) factors. (Def.'s Mot. at 3.)

Finally, Defendant argues that he has a viable release plan, which involves staying with his mother and 24-year-old niece at his mother's home. (Def.'s Mot. at 25.) Defendant avers that both his mother and niece are in good health. (Def.'s Mot. at 25.) And Defendant represents that a family member will be willing to travel to FCI Forrest City to transport him home. (Def.'s Mot. at 25.)

The Government filed its Response to Defendant's Motion on June 25, 2020, (Gov't's Resp. in Opp. to Def.'s Mot. for Compassionate Release ("Gov't Resp.") (ECF No. 490)), and Defendant filed his Reply on June 26, 2020, (Def.'s Reply to Gov't's Resp. in Opp. (ECF No. 495)), rendering Defendant's Motion now ripe for review.

## II. STANDARD OF REVIEW

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify a criminal defendant's sentence for "extraordinary and compelling reasons" "upon motion of the Director of the Bureau of Prisons" or "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion

on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A)(i). By its plain language, § 3582(c)(1)(A) requires defendants to first exhaust administrative remedies or wait thirty days after requesting that the warden of their facility file a motion for a sentence reduction; however, courts have waived this requirement when enforcing it would prove futile. *See, e.g., Washington v. BOP*, 2019 WL 6255786, at *2 (N.D. Ohio July 3, 2019) (explaining in addressing motion for recalculation of good time credit under First Step Act that "[t]he failure to exhaust administrative remedies may be excused if seeking administrative remedies would be futile.").

Once the administrative remedies under § 3582(c)(1)(A) have been exhausted or waived, the Court may reduce or modify a sentence when "extraordinary and compelling reasons warrant such a reduction." In determining what constitutes "extraordinary and compelling reasons," courts have considered related policy statements under the United States Sentencing Guidelines, though such statements are not binding. *See, e.g., United States v. Beck*, __ F. Supp. 3d ___, 2019 WL 2716505, at *8 (M.D.N.C. June 28, 2019) (considering what the Sentencing Guidelines defined as "extraordinary and compelling reasons"). These policy statements provide that a defendant's medical conditions, age, family circumstances or other circumstances, either singly or in combination, can prove sufficiently extraordinary and compelling to justify compassionate release. USSG § 1B1.13, application notes 1(A)-(D).

However, to be extraordinary and compelling, a defendant's medical conditions must be either "terminal . . . with an end of life trajectory" or must "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13, application note 1(A). Similarly, a

defendant may be released based on his advanced age when he "is at least 65 years old," "is experiencing a serious deterioration in physical or mental health because of the aging process" and "has served at least 10 years or 75 percent of his or her term of imprisonment." § 1B1.13, application note 1(B). Defendants may also seek compassionate release based on family circumstances, including when the caregiver of a defendant's minor child has died or become incapacitated, or when the defendant's spouse or partner has become incapacitated and the defendant constitutes the only available caregiver. § 1B1.13, application note 1(C). Finally, the Sentencing Guidelines contemplate situations in which "there exists in the defendant's case an extraordinary and compelling reason [for compassionate release] other than, or in combination with, [the defendant's medical conditions, age and family circumstances]." § 1B1.13, application note 1(D).

Relevant here, "[i]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. Feiling (Feiling I)*, __ F. Supp. 3d __, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020) (citing *United States v. Dungee*, 2020 WL 1666470, at *2 (W.D. Va. Apr. 4, 2020); *United States v. Edwards*, __ F. Supp. 3d __, 2020 WL 1650406, at *5 (W.D. Va. Apr. 2, 2020)). "To establish a particularized risk of contracting COVID-19, an inmate must first demonstrate that cases of COVID-19 have emerged at his facility." *United States v. Feiling (Feiling II)*, 2020 WL 5047064, at *7 (E.D. Va. Aug. 26, 2020). However, even then, "COVID-19 and an inmate's susceptibility to it do not justify compassionate release when . . . the inmate refuses additional protections afforded to him by the BOP without good cause and continues to

9

voluntarily place himself in an environment in which he faces the highest risk of contracting the disease." *Id.*

Even if extraordinary and compelling reasons exist for a defendant's compassionate release, § 3582(c)(1)(A) requires courts to consider "the factors set forth in section 3553(a) to the extent they are applicable" and "applicable policy statements issued by the [United States] Sentencing Commission" before granting a sentence modification. To that end, § 3553(a) requires courts to consider, among other factors, the nature and circumstances of the underlying offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the defendant. 18 U.S.C. § 3353(a)(1)-(2). Additionally, the Sentencing Commission has advised courts to consider whether, based on the factors set forth in 18 U.S.C. § 3142(g), a defendant would present a danger to the safety of any other person or the community if released.[3] USSG § 1B1.13(2). And the Sentencing Commission has emphasized that a defendant's rehabilitation while incarcerated, alone, proves insufficient to warrant a sentence reduction. § 1B1.13, application note 3.

---

[3] As modified in the context of a compassionate release motion, before releasing a defendant, courts should consider: (1) the nature and circumstances of the offense of conviction, including whether the offense is a crime of violence, a violation of § 1591, a terrorism offense, or an offense involving a minor victim, controlled substance, firearm, explosive or destructive device; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including his or her character, physical or mental condition, family and community ties, financial resources, history of substance abuse and criminal history, as well as whether at the time of the instant offense, the defendant was on a period of probation, parole or other form of release; and, (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g)(1)-(4).

Ultimately, the Court may grant compassionate release only after a defendant establishes an extraordinary and compelling reason for his release and the Court finds that the defendant's release would not undermine the relevant § 3553(a) factors or any relevant policy statements issued by the Sentencing Commission.

### III. ANALYSIS

In response to Defendant's Motion, the Government concedes that "[D]efendant's health conditions, coupled with the location of his incarceration, do, in fact, present an 'extraordinary and compelling reason' that could otherwise warrant compassionate release." (Gov't Resp. at 1.) Accordingly, for purposes of its analysis, the Court will accept that Defendant has presented an extraordinary and compelling reason for his release on home confinement, leaving the Court to consider only whether Defendant's release would comport with the relevant § 3553(a) factors and the guidance provided by the Sentencing Commission.[4]

To that end, as mentioned, Defendant argues that the § 3553(a) factors support his release on home confinement, because he has rehabilitated himself while in prison and has been deemed low-risk by the BOP, and because he will be able to rely on a strong community of support if released. (Def.'s Mot. at 23-26.) Defendant also contends that his release would benefit the public by reducing the risk of further spread of COVID-19 and alleviating the burden on the BOP's healthcare facilities. (Def.'s Mot. at 24.) And Defendant argues that he should have been sentenced to no more than 36 months' imprisonment for his supervised release violation based on the drug amount attributed to him under the Statement of Facts, meaning that he would

---

[4] Here, neither party disputes that Defendant has exhausted his administrative remedies under § 3582(c)(1)(A). Indeed, the Government concedes that Defendant submitted a compassionate release request to the warden at FCI Forrest City-Low on March 25, 2020, more than 30 days before filing his Motion. (Gov't Resp. at 9-10.) As such, the Court finds that it has jurisdiction to consider the merits of Defendant's Motion.

11

already be released had he been sentenced properly. (Def.'s Mot. at 2-3; *see* SOF ¶ 2 (providing that, "[f]or sentencing purposes, the quantity of heroin attributable to [Defendant] is at least 100 but less than 400 grams").)

The Government responds that Judge Spencer properly sentenced Defendant for his supervised release violation, because the underlying offense resulting in Defendant's term of supervised release constituted a class A felony, meaning that the statutory maximum for Defendant's violation would have been 60 months under 18 U.S.C. § 3583(e)(3), well above the 44-month sentence that Judge Spencer ultimately imposed. (Gov't Resp. at 2.) Therefore, the Government maintains that Defendant's arguments regarding his improper sentencing lack merit. (Gov't Resp. at 2-4.)

As for whether Defendant's compassionate release proves consistent with the relevant § 3553(a) factors and policy statements, the Government argues that Defendant still presents a danger to the community that precludes his early release. (Gov't Resp. at 16.) Citing to the relevant factors under 18 U.S.C. § 3142(g), the Government maintains that Defendant presents a danger to the community, because: (1) Defendant's supervised release violation involved the killing of another human being, a serious crime of violence; (2) Defendant pled guilty to murdering his victim and violating his supervised release, which shows that overwhelming evidence existed against him; (3) Defendant has an extensive criminal history, including convictions for disorderly conduct and resisting arrest, possession of cocaine and possession of a firearm with cocaine, as well as conspiracy to distribute cocaine and distribution of cocaine; and, (4) Defendant has a history of violating the conditions of his court-ordered supervision beyond the instant violation of his supervised release. (Gov't Resp. at 17-19.) Based on these factors,

the Government argues that, despite Defendant's rehabilitation while incarcerated, Defendant continues to pose a danger to the community. (Gov't Resp. at 19.)

After considering the parties' arguments, the Court agrees with the Government that Defendant's release on home confinement would undermine the relevant § 3553(a) factors and policy statements. For one, the Court disagrees that the maximum punishment for Defendant's supervised release violation should have been 36 months' imprisonment based on the drug amount attributed to Defendant in the Statement of Facts.

Indeed, the Court's review of the docket reveals that Defendant pled guilty to Count One of the Indictment, which charged Defendant with conspiracy to distribute one kilogram or more of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i) and 846, the maximum penalty for which is life imprisonment. (Indictment (ECF No. 21) at 2; *see also* Plea Agreement at 1 (noting that Defendant agreed to plead guilty to Count One, the maximum penalty for which was life imprisonment).) Under 18 U.S.C. § 3559(a)(1), an offense with a maximum penalty of life imprisonment constitutes a class A felony. For class A felonies, a court may revoke a defendant's term of supervised release and sentence him to "all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on post-release supervision . . . [but no] more than 5 years in prison." 18 U.S.C. § 3583(e)(3). Consequently, the maximum penalty for Defendant's supervised release violation was 5 years, or 60 months — far more than the 44 months imposed by Judge Spencer.

Importantly, that Defendant and the Government agreed in the Statement of Facts that "[f]or sentencing purposes, the quantity of heroin attributable to [Defendant] is at least 100 but less than 400 grams" proves inconsequential to the maximum term of imprisonment for his

13

supervised release violation. (SOF ¶ 2.) Indeed, in the preceding paragraph of the Statement of Facts supporting his plea, Defendant agreed that he conspired with his co-defendants to "knowingly possess with intent to distribute and to distribute *one kilogram or more* of heroin," which constitutes a violation of §§ 841(a)(1), 841(b)(1)(A)(i) and 846. (SOF ¶ 1 (emphasis added).) Therefore, in substance as well as form, Defendant pled guilty to a class A felony and received a sentence for his supervised release violation within the maximum penalties allowed under § 3583(e)(3). As such, the Court finds Defendant's arguments regarding his sentence without merit.

The Court also finds unavailing Defendant's other arguments for compassionate release. Indeed, as noted, while on supervised release, Defendant pled guilty to second-degree murder in state court, the facts in support of which show that Defendant shot his victim at least four times with a firearm that he illegally possessed. (*See* 2007 Pet. at 2-3 (detailing Defendant's murder charge, including that he shot the victim at least four times).) Moreover, Defendant's second-degree murder charge followed previous violations of his supervised release in 2005, namely: two convictions for cruelty to animals, repeated cocaine use, lying about using cocaine, frequenting an area where Defendant knew cocaine would be used, and entering an agreement to become an informant without court permission. (2005 Pet. at 2-3.) And beyond Defendant's instant offense, Defendant has an extensive criminal history, including convictions for disorderly conduct and resisting arrest in 1991 and cocaine and firearms convictions in 1993 and 1995. (PSR ¶¶ 90-93.) Notably, Defendant violated his probation for the 1993 and 1995 offenses in committing his offense of conviction in this matter. (PSR ¶¶ 92-93.)

Together, Defendant's criminal history and the nature of his instant supervised release violation lead the Court to conclude that Defendant would pose a danger to the public if released,

even under conditions of home confinement. Although the passage of time and Defendant's rehabilitation efforts while incarcerated mitigate the Court's concerns, they do not overcome Defendant's extensive history of violating the law without concern for the conditions of his release or, more importantly, the life of another human being. Indeed, the nature of Defendant's instant supervised release violation — a crime of violence that took the life of another — alone, establishes that Defendant likely would pose a danger to the community if released.

Likewise, for the same reasons that Defendant's release would pose a danger to the community, his release would also undermine the relevant § 3553(a) factors. For one, Defendant's history and characteristics demonstrate that his continued incarceration proves necessary, as he has repeatedly ignored the conditions of his release without concern. Additionally, the nature and circumstances of Defendant's second-degree murder charge only bolsters the need for his continued incarceration. And Defendant's repeated violations of court supervision and extensive criminal history require his continued incarceration to promote respect for the law, provide just punishment for his offense, afford adequate deterrence and protect the public.

At bottom, even if Defendant has established extraordinary and compelling reasons for his release on home confinement, the Court, in its discretion and after considering the relevant § 3553(a) factors and policy statements, finds that Defendant's release would pose a danger to the public and undermine the justifications for his original sentence. Accordingly, the Court denies Defendant's Motion for Compassionate Release.

## IV. CONCLUSION

For the reasons set forth above, the Court DENIES Defendant's Motion for Compassionate Release (ECF No. 484).

                                              /s/\
                                              David J. Novak\
                                              United States District Judge

Richmond, Virginia\
Dated: <u>September 2, 2020</u>